NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY, Plaintiff v. JAIMIE MARTINSON, Administratrix of the ESTATE OF JOHN GILBERT MARTINSON, Defendant

No. COA10-17

(Filed 16 November 2010)

**Insurance— automobiles—uninsured motorist coverage— underinsured motorist coverage—notice of coverage available**

The trial court did not err in granting plaintiff insurance company's motion for summary judgment and denying defendant's motion for summary judgment in a case involving uninsured

NATIONWIDE PROP. & CAS. INS. CO. v. MARTINSON

[208 N.C. App. 104 (2010)]

motorist (UM) and underinsured motorist (UIM) coverage. The mailing of the selection/rejection form by plaintiff established that there was not a total failure to inform defendant or decedent that up to $1,000,000.00 in UM/UIM coverage was available.

Appeal by defendant from order entered 26 August 2009 by Judge Yvonne Mims Evans in Mecklenburg County Superior Court. Heard in the Court of Appeals 31 August 2010.

*Robinson, Elliott & Smith, by Katherine A. Tenfelde and William C. Robinson, for plaintiff-appellee.*

*The Law Offices of Michael A. DeMayo, LLP, by Elizabeth G. Grimes and Michael A. DeMayo, for defendant-appellant.*

*Twiggs, Beskind, Strickland & Rabenau, P.A., by Jerome P. Trehy, Jr., for amicus curiae North Carolina Advocates for Justice.*

HUNTER, Robert C., Judge.

Defendant Jaimie Martinson ("Mrs. Martinson"), as administratrix of the estate of John Gilbert Martinson ("Mr. Martinson"), appeals from the trial court's 26 August 2009 order denying her motion for summary judgment and granting plaintiff Nationwide Property and Insurance Company's ("Nationwide") motion for summary judgment. After careful review, we affirm the trial court's order.

## Background

In 2006, Mr. and Mrs. Martinson moved to Charlotte, North Carolina so that Mr. Martinson could begin a new job. In March 2007, the couple purchased a home located in the Eastwood Homes Withrow Downs subdivision. At the time, Eastwood Homes had a relationship with the Doug Helms Agency (the "Helms Agency"), an independent Nationwide agency in Gastonia, North Carolina. Eastwood Homes agreed to refer buyers in their community to the Helms Agency to assist them with their home insurance needs. Mary Plybon ("Ms. Pylbon"), a representative of the Helms Agency, was trained by Nationwide and instructed to discuss all coverage needs with potential customers, including uninsured motorist ("UM") and underinsured motorist ("UIM") coverage.

In March 2007, Ms. Plybon first contacted Mr. Martinson by telephone and asked if he would be interested in general information regarding homeowners' insurance and other Nationwide services. Mr.

NATIONWIDE PROP. & CAS. INS. CO. v. MARTINSON

[208 N.C. App. 104 (2010)]

Martinson expressed interest in obtaining Nationwide insurance so Ms. Plybon mailed him several brochures to his home address. In July 2007, Ms. Plybon received information from Eastwood Homes that Mr. and Mrs. Martinson were expected to close on their new home soon. As a follow-up to their March conversation, Ms. Plybon called Mr. Martinson and asked if he was interested in receiving insurance quotes from Nationwide. Though Ms. Plybon does not remember all of the details of their conversation, the record shows that Ms. Plybon emailed Mr. Martinson the following quote on 17 July 2007, which was based on the same coverage the Martinsons had with Allstate at the time: (1) "Bodily Injury" coverage of "50/100" "Per Person/Occurrence"; (2) "Uninsured Motorists-Bodily Injury" coverage of "50/100" "Per Person/Occurrence"; (3) "Uninsured Motorists-Property Damage" coverage of "25000" "Per Occurrence"; and (4) "Underinsured Motorists-Bodily Injury" coverage of "50/100" "Per Occurrence[.]" The same day, Mr. Martinson emailed Ms. Plybon and asked for a quote on "100/300" UIM coverage. The next morning, Ms. Plybon emailed Mr. Martinson and informed him that she "adjusted the auto quote per [his] request . . . and increased the liability limits on the UM/UIM coverage to 100/300." Ms. Plybon requested that Mr. Martinson provide her with the VIN numbers for the automobiles that were to be covered under the policy as well as the Martinsons' driver's license numbers.

On 2 August 2007, having not received the requested information, Ms. Plybon contacted Mr. Martinson and asked that he forward the information to her and reminded him that his Allstate policy was scheduled to automatically renew on 22 August 2007. On 8 August 2007, Mr. Martinson called Ms. Plybon with the requested information and finalized the coverage he had selected, which included the 100/300 UM and UIM coverage. Ms. Plybon sent Mr. Martinson an email verifying his coverage selections. The parties do not dispute that Ms. Plybon never discussed with Mr. Martinson the fact that he could select up to $1,000,000.00 in UM/UIM coverage; however, Ms. Plybon stated in her deposition that had Mr. Martinson requested additional coverage beyond the 100/300 discussed, she would have been prepared to offer him a quote.

On 20 August 2007, Ms. Plybon spoke with Mr. Martinson again and processed his application for insurance per his request. Mr. Martinson paid the $465.00 premium for six months of coverage August 2007 through 22 February 2008. The declarations page provided in the record shows that Mr. Martinson is the "Named Insured" on the policy and Mrs. Martinson is listed as an "Insured Driver." Mrs.

NATIONWIDE PROP. & CAS. INS. CO. v. MARTINSON

[208 N.C. App. 104 (2010)]

Martinson never spoke with anyone at the Helms Agency prior to her husband's purchase of coverage. At that point, Mr. Martinson had purchased the six-month policy, but had not signed any documentation with Nationwide.

According to Ms. Plybon, Mr. Martinson requested that the application be mailed to his new home at 603 Wrayhill Drive. Ms. Plybon then requested that Melissa Melton ("Ms. Melton"), an operations manager at the Helms Agency, mail the application and the selection/rejection form promulgated by the North Carolina Rate Bureau to Mr. Martinson. Ms. Melton testified at her deposition that when she processes a payment for insurance coverage, the Nationwide computer automatically prints the insured's application and a selection/rejection form. Ms. Melton claimed that once Mr. Martinson's materials were printed, she checked to make sure that the application and selection/rejection form were in order before applying the proper postage and addressing the envelope to 603 Wrayhill Drive. Ms. Melton then emailed Ms. Plybon to inform her that she had prepared the Martinson materials as requested. A copy of the application and the selection/rejection form were retained in the Helms Agency's files.

Since the mail had already been picked up that day, Ms. Melton waited until the next day, 21 August 2007, to place the envelope in the Helms Agency's mailbox located in front of the office. According to Doug Helms, the envelope had a return address, but the envelope was never returned to the Helms Agency. Mr. Martinson never signed and returned the documents mailed to him, and, according to Ms. Melton, he never called the Helms Agency to say that he did not receive the envelope mailed on 21 August 2007. Mrs. Martinson claims that neither she nor her husband ever received that envelope.

On 11 September 2007, approximately three weeks after Mr. Martinson purchased the automobile policy from Nationwide, he was involved in a serious motor vehicle accident and was hospitalized. On 12 September 2007, Mrs. Martinson called Ms. Plybon to inform her that Mr. Martinson had been in an accident and may not survive. That same day, Angie Helms ("Mrs. Helms"), the wife of Doug Helms and part-time employee of the Helms Agency, called Mrs. Martinson to follow-up on the application that was mailed to Mr. Martinson, but never returned. In her deposition, Mrs. Helms claimed that she did not know that Mr. Martinson had been in an accident and her call was in accord with the Helms Agency's follow-up protocol. That same day,

Mrs. Helms mailed Mrs. Martinson another copy of the application and selection/rejection form.

When Mrs. Martinson received the materials mailed on 12 September 2007, she called Mrs. Helms to ask if she was authorized to sign the application and selection/rejection form. Mrs. Helms told her that since she was a named insured on the policy, she could sign the forms. Mrs. Martinson claimed in her affidavit that Mrs. Helms told her that if she did not sign the forms, her husband would not be covered for the accident; however, Mrs. Helms denied these allegations in her deposition.

Mr. Martinson died on 18 September 2007 due to the injuries he suffered in the 11 September 2007 car accident. Mrs. Martinson stated in her affidavit that representatives from the Helms Agency continued to call her and ask that she sign and return the application and selection/rejection form. On 26 September 2007, Mrs. Martinson spoke with Ms. Melton and asked that the signature pages of the application be emailed to her. At this time, Mrs. Martinson was represented by counsel in connection with her husband's accident; however, it is disputed as to whether Mrs. Martinson informed the Helms Agency of this fact. It is undisputed that Mrs. Martinson did not seek her attorney's advice regarding the forms sent to her by Nationwide. On 26 September 2007, Mrs. Martinson signed the application and selection/rejection form and returned it to the Helms Agency. Although the pre-printed signature lines on the documents call for the signature of John Martinson, Mrs. Martinson signed the forms with her own signature.

On 20 August 2008, Nationwide filed a complaint for declaratory judgment pursuant to Rule 57 of the North Carolina Rules of Civil Procedure. Nationwide requested that "the Court issue a Declaration of Judgment indicating that the total available underinsured motorist coverage is in the amount of $100,000/$300,000 . . . ." On or about 18 September 2008, Nationwide filed an amended complaint for declaratory judgment. On or about 18 November 2008, Mrs. Martinson, as administratrix of her husband's estate, filed an answer in which she requested that "the Court declare that Plaintiff's policy provides $1,000,000.00 in UIM coverage for Defendant's claims arising from the September 11, 2007 Accident[.]"

The parties filed cross-motions for summary judgment, and on 26 August 2009, the trial court, after hearing arguments from counsel, granted Nationwide's motion for summary judgment and denied that

of Mrs. Martinson. The trial court held that "Nationwide shall provide that amount of uninsured and underinsured motorist (UM/UIM) coverage to the Defendant . . . as shown on the automobile declarations page in the amount of $100,000.00 per person and $300,000.00 per accident . . . ." Mrs. Martinson timely appealed the trial court's order.

## Standard of Review

" 'The standard of review on appeal [from] summary judgment is whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. The question is whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact.' " *Woods v. Mangum*, ―― N.C. App. ――, ――, 682 S.E.2d 435, 438 (2009) (quoting *Sellers v. Morton*, 191 N.C. App. 75, 81, 661 S.E.2d 915, 920-21 (2008)), *aff'd per curiam*, 689 S.E.2d 858 (2010). "The burden is upon the moving party to show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *McGuire v. Draughon*, 170 N.C. App. 422, 424, 612 S.E.2d 428, 430 (2005) (citation omitted). "All facts asserted by the [nonmoving] party are taken as true and their inferences must be viewed in the light most favorable to that party." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (internal citations omitted). On appeal, this Court reviews an order granting summary judgment *de novo*. *McCutchen v. McCutchen*, 360 N.C. 280, 285, 624 S.E.2d 620, 625 (2006). "Accordingly, we must examine the evidence herein to determine whether it reveals a genuine issue of material fact regarding the amount of UIM coverage provided in the policy; if not, the trial court properly granted plaintiff judgment as a matter of law." *Hendrickson v. Lee*, 119 N.C. App. 444, 448, 459 S.E.2d 275, 278 (1995).

## Discussion

Mrs. Martinson argues that the trial court erred in granting Nationwide's motion for summary judgment and denying her motion for summary judgment. Mrs. Martinson's primary assertion is that Nationwide failed to notify her husband prior to his accident that $1,000,000.00 in UM/UIM coverage was available, and, because of this total failure to notify, her husband's estate is entitled to $1,000,000.00 in UIM coverage for the 11 September 2007 accident. Mrs. Martinson relies heavily on N.C. Gen. Stat. § 20-279.21(b)(3) (2007) of the Financial Responsibility Act (the "Act") and *Williams v. Nationwide Mutual Ins. Co.*, 174 N.C. App. 601, 621 S.E.2d 644 (2005).

"When examining cases to determine whether insurance coverage is provided by a particular automobile liability insurance policy, careful attention must be given to the type of coverage, *the relevant statutory provisions*, and the terms of the policy." *Smith v. Nationwide Mutual Ins. Co.*, 328 N.C. 139, 142, 400 S.E.2d 44, 47 (1991) (emphasis added). A survey of the applicable case law based on changing statutory mandates is essential to resolving the case *sub judice*. Prior to 1991, "an automobile liability insurance policy with bodily injury liability limits in excess of the statutory minimum was required to provide UIM coverage equal to the policy's bodily injury liability limits, absent an effective rejection." *State Farm Mutual Auto. Ins. Co. v. Fortin*, 350 N.C. 264, 267, 513 S.E.2d 782, 783 (1999); N.C. Gen. Stat. § 20-279.21(b)(4) (1989). Effective 5 November 1991, the General Assembly amended the Act to allow an insured to select UM and UIM coverage "in an amount not to be less than the financial responsibility amounts for bodily injury liability as set forth in G.S. 20-279.5 [$25,000 and $50,000] nor greater than one million dollars." N.C. Gen. Stat. § 20-279.21(b)(4) (1991).

> This amendment created a significant new choice for insureds regarding their options for UIM coverage. Instead of offering only two choices, rejection of UIM coverage or UIM coverage at the same limits as bodily injury liability coverage, the statute, as amended, permits insureds to select any UIM coverage limit from $25,000 to $1,000,000.

*Fortin*, 350 N.C. at 267, 513 S.E.2d at 783. The amendment also set forth:

> If the named insured rejects the coverage required under this subdivision, the insurer shall not be required to offer the coverage in any renewal, reinstatement, substitute, amended, altered, modified, transfer or replacement policy unless the named insured makes a written request for the coverage. Rejection of this coverage for policies issued after October 1, 1986, *shall be made in writing by the named insured on a form promulgated by the North Carolina Rate Bureau and approved by the Commissioner of Insurance.*

N.C. Gen. Stat. § 279.21(b)(4) (emphasis added).

As a matter of first impression, this Court addressed in *Maryland Casualty Co. v. Smith*, 117 N.C. App. 593, 597, 452 S.E.2d 318, 320 (1995) "whether the insured's rejection of underinsured motorists

coverage, prior to the statutory amendment and prior to the approval of the new form reflecting the substance of the statutory amendment, was still valid and effective with respect to an accident that occurred after the rejection form had been substantially revised and after the policy had been renewed." In *Smith,* the insured, Ralph Smith, signed a selection/rejection form on 29 September 1991 in which he rejected UM and UIM coverage on behalf of himself and the other members of his family listed on the policy. *Id.* at 595, 452 S.E.2d at 319. After passage of the 1991 amendment, Smith renewed the policy in March 1992, "but did not request that underinsured motorist coverage be added at that time." *Id.* On 2 May 1992, Joel Smith, Ralph Smith's son, was in an automobile accident. *Id.* The plaintiff insurance company claimed that the Smiths did not have UIM coverage because Ralph Smith did not add that coverage at renewal in 1992. *Id.* Smith argued before the trial court that his rejection of UIM was "ineffective" because the form he signed in September 1991 became "out-dated" after the 1991 amendment. *Id.* at 595-96, 452 S.E.2d at 319. The trial court agreed with Smith and this Court affirmed, holding that "Mr. Smith's rejection executed on 29 September 1991 was no longer valid and effective after the 1991 amendment and after the new selection/ rejection form was issued." *Id.* at 597, 452 S.E.2d at 320. The Court reasoned that the 1991 amendment allowed insureds to select up to $1,000,000.00 in UM/UIM coverage and that the selection/rejection form signed in September 1991 did not include that information. *Id.* at 598, 452 S.E.2d at 321. Accordingly, Ralph Smith was never adequately informed of the $1,000,000.00 coverage option. *Id.* The Court interpreted N.C. Gen. Stat. § 20- 279.21(b)(4) to mean that an insured must be given an opportunity to exercise his or her option to select or reject UM/UIM coverage by executing a proper selection/rejection form. *Id.* Once an up-to-date form is signed, the insurer is not required to obtain a new execution of the document at each renewal period. *Id.* This Court stated that the insurance company's inclusion of the updated form in the 1992 renewal package was "half-hearted at best" since it did not include any rate information and was "hardly calculated to provoke the insured's attention." *Id.* at 598, 452 S.E.2d at 321. The Court did not, however, state the amount of coverage the Smiths were entitled to receive.

This Court addressed a similar issue in *Metropolitan Property and Casualty Ins. Co. v. Caviness,* 124 N.C. App. 760, 478 S.E.2d 665 (1996). There, Caviness was involved in an automobile accident on 29 February 1992. *Id.* at 761, 478 S.E.2d at 666. "At no time prior to the

accident did Caviness execute a selection/rejection form thereby establishing the limit of her UIM coverage. On 16 March 1992, however, Caviness executed the requisite form and selected coverage of $100,000 per person and $300,000 per accident." *Id.* This Court determined that the "dispositive issue" was "whether, absent selection or rejection of UIM coverage by the insured, N.C. Gen. Stat. § 20-279.21(b)(4) mandates UIM coverage in an amount equal to the limit of liability coverage, or, alternatively, in the amount of one million dollars." *Id.* at 763, 478 S.E.2d at 667. We recognized that:

> As codified . . . the 1991 statute is inherently ambiguous regarding the amount of UIM coverage to accord an insured absent a selection or rejection of such coverage. Put simply, when, as here, an insured fails to select or reject UIM coverage, the 1991 statute provides no more than a range of possible coverage limits —not less than liability coverage but not more than one million dollars.

*Id.* The Court determined that because the Financial Responsibility Act is a remedial statute, it must be construed in the insured's favor. *Id.* at 763-64, 478 S.E.2d at 668. Consequently, the Court concluded that "absent completion of an approved selection or rejection form the insured is, as a matter of law, entitled to one million dollars in UIM coverage." *Id.* at 765, 478 S.E.2d at 668.

In *Fortin*, our Supreme Court faced an almost identical question of law as that presented in *Smith*. The insured, Toni Fortin, was injured in an automobile accident on 18 November 1994. *Fortin*, 350 N.C. at 266, 513 S.E.2d at 782. On 15 July 1991, Fortin had executed a selection/rejection form which stated: "I choose to reject Uninsured/Underinsured Motorists Coverage and select Uninsured Motorists Coverage at limits of [Bodily Injury] 100/300[.]" *Id.* at 266, 513 S.E.2d at 783. On 16 January 1992, Fortin's policy renewed and he was not given a fresh opportunity to reject or select UM/UIM coverage. *Id.* As this Court determined in *Smith*, the Supreme Court in *Fortin* held that Fortin's July 1991 rejection was no longer effective after the November 1991 amendment. *Id.* at 267, 513 S.E.2d at 783. Accordingly, "there was no valid rejection of UIM coverage in th[at] case." *Id.* In determining the amount of coverage owed to Fortin, the Supreme Court's remedy took into account the 1992 amendment to the statute. Effective 1 October 1992, N.C. Gen. Stat. § 20-279.21(b)(4) was amended and resolved the ambiguity described in *Caviness*. As revised, the statute states: "If the named insured does not reject

underinsured motorist coverage and does not select different coverage limits, the amount of underinsured motorist coverage shall be equal to the highest limit of bodily injury liability coverage for any one vehicle in the policy." N.C. Gen. Stat. § 20-279.21(b)(4) (1992). The *Fortin* Court recognized that the 1992 amendment was in effect "on the date of the last renewal of the policy prior to and on the date of [Fortin's] accident[.]" 350 N.C. at 271, 513 S.E.2d at 786. The Court reasoned that, "[o]n each of these dates, the highest limit of bodily injury liability coverage for any one vehicle in the State Farm policy was $100,000 per person and $300,000 per accident. Therefore, because there was neither a valid rejection of UIM coverage nor a selection of different coverage limits, [Fortin's] UIM coverage is $100,000 per person and $300,000 per accident." *Id.*

Six years later, this Court decided *Williams*. There, a minor, Ashley Williams, was injured in an accident caused by the driver of the automobile, Jeremy Canady. *Williams*, 174 N.C. App. at 602, 621 S.E.2d at 645. On the date of the accident, 17 July 2001, the Canady's vehicle was insured by Nationwide with bodily injury coverage of $50,000.00 per person and $100,000.00 per accident. *Id.* The parties in the case stipulated to the following facts:

> The Canady policy was issued to Mr. and Mrs. Canady initially in 1984, and, except for periods of time when the policy was cancelled due to the Canadys' failure to pay the premium, it remained in effect through July 17, 2001, either through new, reinstated or renewal policies. The Canady policy was last renewed prior to the July 17, 2001 accident on June 12, 2001 for the policy period from June 12, 2001 to December 12, 2001. Neither Mr. Canady nor Mrs. Canady were offered by Nationwide or its authorized agent an opportunity to select or to reject UIM limits greater than their liability limits at any time prior to July 17, 2001. The option to select or reject UIM limits that are greater than the policy's liability limits was not available to insureds in North Carolina at any time prior to the effective date of the 1991 amendments to the UIM statute. Neither Mr. Canady nor Mrs. Canady signed a North Carolina Rate Bureau UM/UIM selection/rejection form for the Canady policy at any time prior to July 17, 2001.

*Id.* at 603, 621 S.E.2d at 645-46. This Court determined that, unlike in *Fortin*, there was a "total failure to provide the insured with an opportunity to select UIM coverage." *Id.* at 604, 621 S.E.2d at 647. The Court then acknowledged that N.C. Gen. Stat. § 20-279.21(b)(4) "does

not address the applicable default policy limits where the insured is not given the opportunity to select or reject the UIM policy limits[.]" *Id.* at 605, 621 S.E.2d at 647. Relying on *Caviness*, where the Court resolved the statute's ambiguous language in favor of the insured, the *Williams* Court held that the insured was entitled to $1,000,000.00 in UIM coverage. *Id.* The Court went on to state:

> A *total failure* on the part of the insurer to provide an opportunity to reject UIM coverage or select different UIM policy limits violates the requirement that these choices be made by the policy owner. Such a failure should not invoke the minimum UIM coverage limits established in N.C.G.S. § 20-279.21(b)(4) and shield the insurer from additional liability. So doing would violate the purpose of the statute to protect the insured and allow them to choose their policy benefits.

*Id.* at 605-06, 621 S.E.2d at 647 (emphasis added).

In examining the case law and the relevant statutory modifications, it is clear that an insured must be given the opportunity by the insurer to select or reject UIM and UM coverage. Since 1991, our legislature has required that a named insured sign a selection/rejection form promulgated by the North Carolina Rate Bureau indicating his or her selection or rejection of coverage. N.C. Gen. Stat. § 279.21(b)(4). Where the insurer attempts to notify the insured of the $1,000,000.00 maximum UM/UIM coverage, but there is neither a *valid* rejection of that coverage nor a selection of different coverage limits, an insured is entitled to the highest limit of bodily injury liability coverage on the insured's policy. *Id.*; *Fortin*, 350 N.C. at 271, 513 S.E.2d at 786. However, if there is a *total failure* by the insurer to notify the insured that he or she may purchase up to $1,000,000.00 in UM/UIM coverage, then the insured is entitled to $1,000,00.00 in coverage. *Williams*, 174 N.C. App. at 605-06, 621 S.E.2d at 647.

At the time of Mr. Martinson's accident, N.C. Gen. Stat. § 20- 279.21(b)(3) governed UM/UIM coverage and is substantively identical to the 1992 amended version in which the relevant provisions were found under subsection (b)(4). N.C. Gen. Stat. § 20-279.21(b)(3) (2007) reads in pertinent part:

> An insured named in the policy may select different coverage limits as provided in this subdivision. If the named insured in the policy does not reject uninsured motorist coverage and does not select different coverage limits, the amount of uninsured

motorist coverage shall be equal to the highest limit of bodily injury and property damage liability coverage for any one vehicle in the policy. Once the option to reject the uninsured motorist coverage or to select different coverage limits is offered by the insurer, the insurer is not required to offer the option in any renewal, reinstatement, substitute, amended, altered, modified, transfer, or replacement policy unless the named insured makes a written request to exercise a different option. The selection or rejection of uninsured motorist coverage or the failure to select or reject by a named insured is valid and binding on all insureds and vehicles under the policy. Rejection of or selection of different coverage limits for uninsured motorist coverage for policies under the jurisdiction of the North Carolina Rate Bureau shall be made in writing by a named insured on a form promulgated by the Bureau and approved by the Commissioner of Insurance.

Mrs. Martinson relies on *Williams* and claims that there was a total failure by Nationwide to inform Mr. Martinson that UM/UIM coverage limits of up to $1,000,000.00 was available, and, therefore, Mr. Martinson had UIM coverage in the amount of $1,000,000.00 for the 11 July 2007 accident. We disagree.

The material facts in this case are undisputed. Nationwide claims that it mailed Mr. Martinson his application and selection rejection form on 21 August 2007 to the proper address. Mrs. Martinson claims that she never received that form, and, to the best of her knowledge, Mr. Martinson did not receive that form. The question, therefore, is whether the mailing of the selection/rejection form by Nationwide was sufficient to satisfy the standard of notice established by our case law upon interpretation of N.C. Gen. Stat. § 20-279.21(b)(3) even where the insured does not receive it prior to an accident in which he claims UIM coverage. We hold that it does and that there was not a *total failure* on the part of Nationwide to provide an opportunity for Mr. Martinson to reject UIM coverage or select different UIM policy limits. The mailing of the selection/rejection form to Mr. Martinson the day after he paid for the coverage prevents us from holding that a total failure to inform occurred. In *Williams*, the parties stipulated that there was no effort whatsoever on the part of the insurer to provide the insured a selection/rejection form. 174 N.C. App. at 603, 621 S.E.2d at 646. That is not the case here.

NATIONWIDE PROP. & CAS. INS. CO. v. MARTINSON

[208 N.C. App. 104 (2010)]

Though Mrs. Martinson claims that neither she nor her husband received the form, there is no evidence to contradict Nationwide's assertion that it was mailed on 22 August 2007.

> Moving [for summary judgment] involves giving a forecast of his own which is sufficient, if considered alone, to compel a verdict or finding in his favor on the claim or defense. In order to compel the opponent's forecast, the movant's forecast, considered alone, must be such as to establish his right to judgment as a matter of law."

*Talbert v. Choplin,* 40 N.C. App. 360, 363-64, 253 S.E.2d 37, 40 (1979). Nationwide has established through testimony of its employees, and through supporting electronic documentation, that the envelope containing the selection/rejection form was mailed on 22 August 2007. That envelope was never returned by the postal service and Mr. Martinson never called to say that he did not receive the forms. Mrs. Martinson claims that she and her husband were very tidy and that the mail that came into the house was always placed on a certain table so that she and Mr. Martinson could both see what had arrived. When asked how she knew that they never received the envelope, Mrs. Martinson responded: "Because I didn't see—because I don't ever remember receiving this." Mrs. Martinson's assertions pertain to her receipt of the envelope, not whether it was actually sent.

Mrs. Martinson argues in her brief to this Court that the mailbox rule, which creates a rebuttable presumption that an envelope sent via the postal service with proper postage was delivered to the intended party, *Sherrod v. Farmers' Mutual Fire Ins. Ass'n,* 139 N.C. 167, 51 S.E. 910 (1905), is not applicable in this case.[1] We decline to address the applicability of the mailbox rule since we hold that the mailing of the selection/rejection form by Nationwide establishes that there was not a total failure to inform Mr. Martinson that up to $1,000,000.00 in UM/UIM coverage was available.[2]

Our holding in this case is in line with this Court's recent decision in *Nationwide Mutual Ins. Co. v. Burgdoff,* —— N.C. App. ——, 698

---

1. Nationwide makes some effort to rebut Mrs. Martinson's argument; however, Nationwide does not specifically argue that the mailbox rule is applicable.

2. Mrs. Martinson argues that for Nationwide to avail itself of the rebuttable presumption of the mailbox rule, it must demonstrate that it placed the envelope in the care and custody of the U.S. postal service. Mrs. Martinson argues that while there is no case on point, Rule 5(b) of the North Carolina Rules of Civil Procedure provides persuasive authority. N.C. Gen. Stat. § 1A-1, Rule 5(b) (2009) states: "Service by mail shall be complete upon deposit of the pleading or paper enclosed in a post-paid, properly addressed

S.E.2d 500 (2010). There, the Nationwide insurance agent, Ms. Bare, provided an affidavit in which she stated that she had *verbally* informed Mrs. Burgdoff that she could select UIM coverage in an amount up to $1,000,000.00. —— N.C. App. at ——, 698 S.E.2d at 504. The Burgdoffs claimed that they were never informed of that option. *Id.* It was undisputed that a selection/rejection form was never mailed. *Id.* at ——, 698 S.E.2d at 502. The Burgdoffs relied on *Williams* and argued that Nationwide's "failure to provide [them] with [a] selection/rejection form constitute[d] a *per se* total failure to provide an opportunity to reject UIM coverage or select different UIM policy limits[.]" *Id.* at ——, 698 S.E.2d at 503. In analyzing *Williams*, this Court in *Burgdoff* stated: "There is nothing in *Williams* that would support expanding its holding beyond situations where an insured was never given the opportunity to reject or select different coverage limits." *Id.* The Court further stated: "Along these same lines, the deciding factor for the *Williams* Court was not that the insured was not provided with the proper selection/rejection form; instead, the Court emphasized that the insured was not provided with *any opportunity at all* to even consider UIM coverage." *Id.* The *Burgdoff* Court determined that there was a material issue of fact as to whether the Burgdoffs were *verbally* informed by Ms. Bare that they could purchase up to $1,000,000.00 in UIM coverage. *Id.* at ——, 698 S.E.2d at 503-04. Accordingly, the issue of whether there was a total failure was left to the jury. *Id.* Nevertheless, the Court's holding clearly establishes that verbally informing an insured of the UIM coverage limits is sufficient to distinguish the case from *Williams*.[3]

In the present case, Mr. Martinson was not verbally informed of the UIM coverage limits, but the selection/rejection form was mailed to him in a timely manner. There is no issue of material fact as to that point. As stated in *Williams*, and reiterated in *Burgdoff*, the critical determination is whether the insured was given some "opportunity to reject or select different coverage limits." *Id.*; *Williams*, 174 N.C. App. at 605, 621 S.E.2d at 647. Mr. Martinson was insured at the time of the accident for 100/300 UM/UIM coverage and we cannot say that

---

wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service." We note that this argument is unpersuasive. Rule 5(b) strictly governs service of a complaint upon a defendant and should not be used to require a business or an individual to take mail directly to the post office or place it in an official depository in order to take advantage of the mailbox rule.

3. The Court in *Burgdoff* did not create a requirement that an insured by verbally informed of UM/UIM coverage limits.

mailing a selection/rejection form by Nationwide that was never signed prior to the accident is a *total failure* on the part of Nationwide to inform the insured of available coverage that would require adherence to *Williams*. Consequently, we affirm the trial court's order.

Finally, there was an amicus brief filed in this case by the North Carolina Advocates of Justice ("NCAJ") in which the NCAJ requests that we establish a clear standard that would require an insurer to prove "actual notice" in circumstances such as the one at issue. We decline to address the merits of NCAJ's request; however, in the present case we clearly did not require a showing of actual notice. The mailing of the selection/rejection form was sufficient to preclude a holding that a total failure to notify occurred. Effective 1 February 2009, N.C. Gen. Stat. § 20-279.21(b)(3) was materially altered. For cases governed by the previous version of the statute, the existing case law is controlling.

Conclusion

Based on the foregoing analysis, we hold that the trial court did not err in denying Mrs. Martinson's motion for summary judgment and properly granted Nationwide's motion for summary judgment.

Affirmed.

Judges BRYANT and CALABRIA concur.