REYNOSO v. MALLARD OIL CO.

[223 N.C. App. 58 (2012)]

––––––––––––––

FRANCISCO JAVIER LOPEZ REYNOSO AND MARIBEL MORALES JARDON, PLAINTIFFS v. MALLARD OIL COMPANY, DEFENDANT

No. COA11-1537

(Filed 2 October 2012)

**Negligence—inspection of underground storage tanks—inherently dangerous activity—no breach of duty—justifiable reliance on subcontractor**

The trial court did not err in granting summary judgment in favor of defendant employer (an oil company) in a negligence action. Even if the inspection of underground storage tanks was an inherently dangerous activity and defendant owed a non-delegable duty to plaintiffs, there was nothing in the record demonstrating defendant's breach of such duty and defendant justifiably relied on the expertise of its independent subcontractor.

Appeal by plaintiffs from order entered 20 July 2011 by Judge Benjamin G. Alford in Lenoir County Superior Court. Heard in the Court of Appeals 23 April 2012.

*The Olive Law Firm, PA, by Juan A. Sanchez, for plaintiffs-appellants.*

*Sumrell, Sugg, Carmichael, Hicks & Hart, PA, by Scott C. Hart and Anakah D. Harrison, for defendant-appellee.*

BRYANT, Judge.

REYNOSO v. MALLARD OIL CO.

[223 N.C. App. 58 (2012)]

Where an employer justifiably relied on the expertise of its independent subcontractor, the summary judgment order entered in favor of the employer is affirmed.

### Facts and Procedural History

On 13 May 2010, plaintiffs Francisco Javier Lopez Reynoso ("Francisco") and Maribel Morales Jardon ("Maribel") (collectively "plaintiffs") filed a complaint against defendants Mallard Oil Company ("Mallard") and Harvey Enterprises, Inc. ("Harvey") alleging negligence.

Mallard, a wholly owned subsidiary of Harvey, owned and operated underground storage tanks ("UST") containing petroleum in Ernul, North Carolina. Part of defendant's primary business was the sale, transfer, and storage of petroleum products. Defendant subcontracted its duty to maintain, inspect, and clean the UST located on its property to Superior Testing Services, Inc. ("STS").

On 8 October 2008, STS sent a four man crew consisting of three technicians and a laborer, Francisco, to Mallard's project site. Prior to inspecting the UST, it was the responsibility of defendant to remove the fuel from the UST. It was then the responsibility of STS to physically enter the tanks and clean any remaining fuel from the tanks. After cleaning, STS would inspect the UST, a process that consisted of visually observing the coating condition, taking coating thickness and hardness readings, and taking metal thickness readings of the tank shell. However, prior to entering the UST, STS would test to make sure the fuel had been pumped out, then cut through concrete down to the tops of the UST, and unseal the tops of the UST. After the inspection, a process called grinding was used to remove epoxy from the lid of the tank in order to reattach the lid to the UST.

The next day, on 9 October 2008, the manhole lids were removed from the three gasoline tanks[1] and a purge–used to create air flow through the tank in order to remove dangerous vapors-was started on tank #1 at approximately 8:10 a.m. At 8:30 a.m., the volatile vapor reading in the tank was .2; the technicians entered the tank and by 9:15 a.m had cleaned the residual fuel and sludge. At 9:40 a.m., the STS crew entered tank #2 and cleaned that tank of residual fuel. Francisco was directed by his supervisor to grind down the opening on tank #1 in preparation for sealing it. Francisco alleged that an hour

---

1. Mallard's station had three manifolded unleaded gas tanks. These tanks are linked together, manifolded using a series of pipes for storage of a particular grade of fuel.

and fifteen minutes had passed since any technicians had visually inspected tank #1 or its volatile vapor meter. Francisco had completed three and a half sides when witnesses stated they heard a whoosh and observed a fire ball erupting out of tank #1. Francisco was severely burned and left with life-threatening injuries. Following the accident, members of the STS crew entered tank #1 and observed a spot of gasoline on the floor of the tank.

On 23 June 2011, defendants filed a motion for summary judgment. A hearing was held on 5 July 2011 where plaintiffs' counsel stipulated to summary judgment being entered as to defendant Harvey. The trial court then entered an order on 20 July 2011 granting Mallard's motion for summary judgment and dismissing plaintiffs' claims. The trial court's order stated the following:

> After considering the arguments of counsel, including the discovery materials, deposition transcripts, and pleadings and after reviewing pertinent case law and giving this matter full consideration, this Court concludes, as a matter of law, that the activity given [sic] rise to this claim was not inherently dangerous according to the evidence of record. Accordingly, this Court determines that there are no genuine issues as to any material fact and that Defendant Mallard Oil Company is, therefore, entitled to judgment as a matter of law.

From this order, plaintiffs appeal.

---

On appeal, plaintiffs argue the trial court erred in entering summary judgment in favor of Mallard (I) by failing to consider defendant's "independent legal obligation to ensure safety and compliance with APT 1361[;]" and (II) and concluding that the activity of cleaning and inspecting UST was not inherently dangerous.

*Standard of Review*

"Our standard of review of an appeal from summary judgment is *de novo*; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Blackwell v. Hatley*, 202 N.C. App. 208, 211, 688 S.E.2d 742, 745 (2010) (citation omitted). "The showing required for summary judgment may be accomplished by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d

829, 835 (2000) (citation omitted). When considering a motion for summary judgment, "[a]ll facts asserted by the [nonmoving] party are taken as true and their inferences must be viewed in the light most favorable to that party." *Nationwide Prop. & Cas. Ins. Co. v. Martinson*, ___ N.C. App. ___, ___, 701 S.E.2d 390, 393 (2010) (citation omitted).

### *I and II*

Plaintiffs argue the trial court erred by granting summary judgment in favor of Mallard. Specifically, plaintiffs contend that state and federal regulations[2] identify "American Petroleum Institute (API) Standard 1631" as one of several acceptable industry standards that may be used by owners and operators of UST to comply with these regulations. Plaintiffs argue that "Mallard had an independent legal obligation to ensure safety and compliance with API 1631[,]" and therefore had a non-delegable duty and "breached its duty to keep [Francisco] safe and free of harm." Plaintiffs also contend that the trial court erred by failing to conclude that the activity of cleaning and inspecting UST was not inherently dangerous. Because plaintiffs' arguments are closely related, we will address them together.

The general rule is that one who employs an independent contractor is not liable for the independent contractor's acts. *Little v. Omega Meats I, Inc.*, 171 N.C. App. 583, 586, 615 S.E.2d 45, 48 (2005) (citation omitted).

> However, if the work to be performed by the independent contractor is either (1) ultrahazardous or (2) inherently dangerous, and the employer either knows or should have known that the work is of that type, liability may attach despite the independent contractor status. This is because, in those two areas, the employer has a non-delegable duty for the safety of others.

*Kinsey v. Spann*, 139 N.C. App. 370, 374, 533 S.E.2d 487, 491 (2000) (citations omitted).

Plaintiffs concede that although there is no authority establishing the cleaning and inspection of UST as an inherently dangerous activity, they argue that the necessary elements for what comprises an

---

2. Plaintiffs direct the Court to 40 CFR Part 280 entitled "Technical Standards and Corrective Action Requirements for Owners and Operators of Underground Storage Tanks" and 15A Subchapter 2N of the North Carolina Administrative Code entitled "Underground Storage Tanks."

inherently dangerous activity are met. An "inherently dangerous activity" is defined

> as work to be done from which mischievous consequences will arise unless preventative measures are adopted, and that which has a recognizable and substantial danger inherent in the work, as distinguished from a danger collaterally created by the independent negligence of the contractor, which later might take place on a job itself involving no inherent danger.

*O'Carroll v. Roberts Indus. Contractors, Inc.*, 119 N.C. App. 140, 146, 457 S.E.2d 752, 756 (1995) (citation and quotations omitted). A successful inherently dangerous activity claim requires a showing of four elements: (1) the activity must be inherently dangerous; (2) at the time of injury, the employer either knew, or should have known, that the activity was inherently dangerous; (3) the employer failed to take the necessary precautions to control the attendant risks; and, (4) the failure by the employer proximately caused injury to plaintiff. *Kinsey*, 139 N.C. App. at 375, 533 S.E.2d at 492.

We find *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991) to be instructive. The facts in *Woodson* are as follows: Pinnacle One Associates ("Pinnacle") was the developer of a construction project, and it retained the defendant Davidson & Jones, Inc. ("Davidson") as its general contractor. *Id.* at 334, 407 S.E.2d at 225. Davidson hired subcontractor Morris Rowland Utility ("Morris") to dig a sanitary sewer line. However, on 3 August 1985, workers from both Morris and Davidson were digging trenches to lay sewer lines. *Id.* Once at the site, the Davidson foreman refused to let his men work in the trenches because they were not sloped, shored, or braced and did not have a trench box as required as a safety precaution under the Occupational Safety and Health Act of North Carolina. *Id.* at 335, 407 S.E.2d at 225. Morris procured a trench box for the Davidson crew but did not acquire a trench box for its own crew. *Id.* Rowland's employee Thomas Sprouse ("Sprouse") died when a trench collapsed, completely burying him. *Id.* at 336, 407 S.E.2d at 226.

The plaintiff, Sprouse's estate, filed suit against Rowland, Rowland's president, Davidson, and Pinnacle. *Id.* at 336, 407 S.E.2d at 226. The trial court granted all defendants' motions for summary judgment and a divided panel of our Court of Apepals affirmed. However, in addressing the plaintiff's claims against Davidson and Pinnacle, that they each breached nondelegable duties of safety owed to the decedent, the Supreme Court reversed summary judgment in

favor of Davidson and affirmed summary judgment in favor of Pinnacle. The *Woodson* Court noted that

> [g]enerally, one who employs an independent contractor is not liable for the independent contractor's negligence unless the employer retains the right to control the manner in which the contractor performs his work. Plaintiff can recover neither from Davidson & Jones nor from Pinnacle One unless the circumstances surrounding the trench cave-in place her claim within an exception to this general rule.

*Id.* at 350, 407 S.E.2d at 234 (internal citation omitted). The plaintiff argued her action fell within the exception that the trenching project was an inherently dangerous activity and that "[Davidson and Pinnacle] failed to take adequate measures to correct [Rowland's] poor safety practices." *Id.*

The *Woodson* Court held that because Davidson "knew at all material times preceding the cave-in that [Rowland] was not following standard, regulatory safety procedures[,]" it could not "escape liability by merely relying on the legal ground that [Rowland] was an independent contractor." *Id.* at 356-57, 407 S.E.2d at 238. In regards to Pinnacle's liability, however, the *Woodson* Court made the following notable distinction:

> We need not decide whether [Pinnacle] . . . owed a nondelegable duty to plaintiff's intestate. Assuming that it did, we find nothing in the forecast of evidence to show that such a duty was breached by [Pinnacle.] There is nothing in the forecast indicating that [Pinnacle] or any of its representatives knew or should have known that [Davidson] had hired [Rowland], much less of the trenching activity in which plaintiff's intestate was engaged or the dangerous propensities of the particular trench in question. There is no forecast that [Pinnacle] had any knowledge or expertise regarding safety practices in the construction industry generally or in trenching particularly. . . . [Pinnacle] justifiably relied entirely on the expertise of its general contractor [Davidson.]

*Id.* at 357-58, 407 S.E.2d at 238.

*Woodson* confirms that

> [l]iability for injuries caused by such activities is not strict, but is based on negligence. The reason for imposing a negligence

standard for liability resulting from inherently dangerous activities is that exercise of reasonable care can control the risk, and the responsible parties will not be held liable unless they have caused injury by failing to do so.

*Id.* at 351, 407 S.E.2d at 234-35 (internal citation omitted).

In the instant case, assuming *arguendo* that the inspection of UST was an inherently dangerous activity and thus Mallard owed a non-delegable duty to plaintiffs, we find nothing in the record establishing that such a duty was breached by Mallard. There is nothing in the record indicating that at the time of injury, Mallard knew or should have known of the potentially dangerous circumstances surrounding UST #1. Frank Famularo (Famularo), president of Mallard, testified that the only obligation Mallard had during the October 2008 inspection "was to remove the fuel from the [UST] prior to the [cleaning and] inspection [by STS]. There is no dispute that [Mallard] complied with this obligation." Famularo also testified to the following:

At no time have employees of [Mallard] undertaken the task of inspecting [UST.] No [Mallard] employees have the required knowledge or expertise in the field of inspecting underground fuel storage tanks and, accordingly, are not aware of the safety practices associated therewith.

. . .

The knowledge, training and skill necessary to engage in the work involved in the tank inspection is so specialized and so specific that neither [STS] nor any of their employees receive directions from [Mallard] regarding the work to be done.

According to the record, no Mallard employees were present on 9 October 2008 or at any time during the inspection of the UST, no Mallard employees were involved in any supervisory capacity over STS' inspection of the UST, and no Mallard employees had any knowledge or expertise regarding safety practices in the UST inspection industry.

Further, although plaintiffs' complaint asserted that Mallard "failed to properly supervise its sub-contractor, STS, and to otherwise ensure that STS complied with the appropriate safety measures which would have prevented this accident and injury[,]" the president of STS, Don Lister (Lister), testified that STS employees do not take directions from owners of UST on how to execute the inspection process. Lister also testified that STS is one of very few companies

within the country providing specialized inspection services of UST. These inspections are undertaken by STS crews based on policies and procedures set out, created, and maintained by STS. Other than removing fuel from the UST, Mallard had no obligation or responsibility regarding the cleaning and inspection of the UST. Lister testified that Mallard complied with all of its obligations and responsibilities.

As previously stated and based on a *Woodson* analysis, assuming *arguendo* that the inspection of UST was an inherently dangerous activity and that Mallard owed a non-delegable duty to plaintiffs, we find nothing in the record demonstrating Mallard's breach of such duty. On the contrary, we find that Mallard justifiably relied on the expertise of STS. Even if Mallard should have known that the UST inspection was an inherently dangerous activity, there is no indication that Mallard failed to take precautions, and therefore, Mallard's actions or inaction could not have been the proximate cause of Francisco's injuries. *See Kinsey*, 139 N.C. App. at 375, 533 S.E.2d at 492. Therefore, we hold the trial court did not err in granting defendant Mallard's motion for summary judgment.

Affirmed

Chief Judge MARTIN and Judge MCCULLOUGH concur.